Good morning, and may it please the court, Richard Antonioni for the appellant, and I'd like to reserve two minutes for rebuttal, if I may. All right, you have a clock right there, and I will also try to help you. I appreciate that. This is a case about really three loan modifications or attempted loan modifications, and they are chronologically January 2009, January 2010, and then November 2010. I'd like to talk about the middle one, January 2010. It's actually more like a March 1, 2010 loan modification, because that's when the offer was made by Chase to my client. And if you look at the March 1, 2010 letter, which I believe is at page 914 of the record, go towards the bottom of it, the first page, which is on page 914. Let me quote you the language. After successful completion of a trial period plan, Chase will send you a modification agreement for your signature, which will modify the loan as necessary to reflect the new payment amount. Isn't there something following that that says we will consider? There is something that there is on the second page that says... Right. It takes away the offer made on the first page. It says we will consider. It makes it ambiguous and normal. Correct. And normally ambiguities are construed against the creator of the ambiguity. My question is this. There appear to have been two roadblocks to any modification. Correct me if I'm wrong. Her income and the net present value of the loan. Is that right? No. No. What's right? Okay. What's wrong about it is this was an... My client could look upon the March 1, 2010 letter as an unconditional offer. Contrast it, for example, to the January 2009 letter Chase sent out, which contained... I hate to interrupt you, but it appears to me that she was never eligible for CHAMP or HAMP, ever. Is that right? Because of her income and the loan? Size of the loan? That's a good question. What's the situation? The situation was she was made, at least on March 1, 2010... This is not a trick question. No, I know it's not. Because what follows is that what business did they have of taking all this money from her if she was never eligible in the first place? It's like the subsequent California case that says, first you've got to see whether she's eligible, then you take the money from her. Right. That's the paradox, Your Honor. I mean, if they had said up front, you're not eligible, then they shouldn't have asked for the money. The way I look at the case, she wasn't eligible, ever. Well, they made a determination in making this offer that she was eligible on March 1, 2010. That's what this says. And she proved her eligibility by complying with the terms of the offer, and the only terms in the offer were... Why'd they turn her down? Why'd they turn her down? Right. They turned her down because she was over the HAMP debt limit. What's that? HAMP debt limit at the time, I think, was $729,000. And that's the point I'm trying to make. She's not qualified. She was never qualified for any of this. So they shouldn't have taken the money from her. That's my point. And that's what Judge Wu said. I mean, I think you'd think that because we're suggesting she isn't eligible that she loses her case. And I think what Judge Trott is saying, no, it's the opposite. Yes. If she never was eligible, they shouldn't have given her the money. And that's what Judge Wu said. And then Judge Olguin gets it, and that disappeared. Wu said it's a violation of California statute. Yes, it is. A lawful business practice. It's either she's either eligible or she's not. And if she's not eligible, as you say, then they took $33,000. That's my point. And I'm telegraphing this to your colleague at the table so that he might be able to answer. And it was one of the alternative arguments I made in the opening brief, which I don't think was really addressed in the reply. But that's what got me. Judge Wu said, hey, look, she's right. The left hand. Who's this? Would you please sit down? Thank you. Thank you. It's either or. She's either eligible and they can take the money, or she's not eligible and they can't take the money. Isn't that what Judge Wu said? It looks like an unlawful practice. Yes. And he said it was an unlawful practice. And he talked about the chases through hands. Exactly. And, you know, and. So if that's the case, is there any other argument you have to make? I would say only about the, you know, first of all, you know, going back to the March 1st, 2010 letters, it is ambiguous. Because unlike the other two letters, where they make this offer, the other two letters say if you complete all this, we'll consider you. This letter says both. Yeah. Well, the question is, what business does the business have taking $30,000 from a woman who's ineligible in the first place? I don't know, Your Honor. That's what Judge Wu said. I don't know. You know, there are many names I could give to it, some of which are not very polite, but I think. And the later California case said the appropriate thing is first you discern eligibility and then you check out, take the money. Exactly so. And so this, you know, they strung her along for from basically January 2009 through November through January 2011. Essentially about two years going through, you know, going through this loan modification. And then they said, well, you're not submitting the paperwork. Well, she's got the narrative in there, so they were just jerking me around. That's why I stopped submitting any paperwork. Yeah, and she did, and she submitted a lot. In fact, they only did that argument with the last modification, not with the first two. Right. May I suggest you save your remaining time for rebuttal? I will do that, Your Honor. Thank you. You probably know we have a few questions for you. Yes, Your Honor. Your Honors, good morning, and may it please the Court, Richard Steelman with Brian Cave on behalf of the appellees. To answer Judge Trott's question, the distinction here, and I think the distinguishing factor with the Bushell case, also the Wygod case, the West case, and Corvello cases from the California Courts of Appeal and the Ninth Circuit here, is that this was not a HAMP loan modification review. Well, it wasn't. I mean, we have all these things available. They never specify what they are, but every one she tries for, she turns down. She gets turned down after she pays all this money because she wasn't eligible in the first place. Well, as we argued in our briefing, under the HAMP program, she was not eligible because the loan balance. Ever. Ever. Ever. Right. But what happens, and as it's even noted in the Bushell case, basically when a borrower is in default, these loans go through a waterfall of different programs. And even in the November 2009 denial letter on the excerpt of record, page 551, the letter with the denial of the March 2009 loan mod says, we reviewed your request for a loan modification regarding the various programs, the Making Home Affordable program and or the Chase Modification program. So this CHAMP program, it's a Chase proprietary program that Chase uses its own guidelines to determine and review things. They seem like the same as everything else. I don't believe that they are. Were they specified in there? I mean, why aren't you telling somebody? I'm not accusing you of anything. Before you take $30,000 from them, hey, you're not eligible, period. Well, she, as any borrower would take out a loan, they would have an obligation, a continuing obligation to make payments. Well, that was turned down in the case. We're not interested in that. The argument was, well, you just made payments the way you were supposed to. What's the big deal? Well, I would like to point out. That was dismissed. To your honors, as the distinguishing factor here is this was a summary judgment motion where the court viewed the evidence as to what actually occurred. The court said, really, you lose because you didn't submit all the paperwork. Is that right? The court said that the plaintiff had not produced evidence, and her testimony in her deposition at pages 367 and 371 of the record indicate that she didn't have any employment. Yeah, and the narrative says, because I was being jerked around. Well, she also testifies on pages 367 and 371 that she was self-employed and did not have income. You know, the industry created this gigantic mess in the first place with all the securitization. And then these people get trapped in it. They get told, pay a whole lot of money, and then we'll tell you whether you're eligible or not. Judge Wu seems to be right in this case. Where did that go? Well, I'd like to point out the distinguishing factor here, which I believe, is that those cases were determined on a motion to dismiss or demur stage where the court had to accept the allegations as pleaded as the truth. Here, there's a different standard where the court could look at the specific factors. And even in Appellant's reply brief, they cite to Daniels v. Select Portfolio Servicing. It's a 2016 case from the Court of Appeal. And specifically in the Daniels case, the court noted there, because there was no allegation that HAMP controlled or dictated that loan modification review, and the court wrote, there are no guidelines. And this is 246 Cal. App. 4th, 1150 at page 1174. There are no guidelines for determining the essential terms of the loan modification that Appellants allege they were promised. Without those essential terms or a way to derive them, Appellants do not allege the existence of a sufficiently definite and enforceable contract. Okay, so that's a contract claim. Let's go back to the unfair business practices claim, which we have this decision from Judge Wu, which seemed to have evaporated somewhere. Why wasn't Judge Wu correct to say that on this record, that she has alleged sufficient for a California unfair business practices claim? Well, I think that context, and as the Appellant points out in their reply brief citing to Judge Wu, that was in the context of a motion to dismiss, where the court was bound to accept the pleadings of those allegations, the allegations as pled as the truth. And here, in the West, Corvello, Wygod case, Bushell, they were all determined at a demur or motion to dismiss stage, where the court wasn't able to look at all of the evidence and what was stated here. And here, these agreements say, we will consider you for solutions. It doesn't state and explain that there's a waterfall of options, but Ms. Escui would be eligible for a potential champion for the high term modification. We have to kind of separate the contract claim from the unfair business practices claim. So let's just assume right now that there's not a contract claim, and have you address why, in the context of this, there's not at least a factual issue about whether there's a business practices claim. Well, I think here, because the borrower was saying, we will consider you for alternatives, they expressed language saying that this does not change the terms of your deed of trust. And note, it's not preventing a foreclosure. You'll go through this review process, and while the review process is ongoing, we won't foreclose. I don't think that that's an inherently unfair practice. What proprietary program was she eligible for? It was called the CHAMP program. And through that program, one thing, and even as the Bushell case, So you're saying she was eligible for CHAMP? Yes. But not HAMP? Ultimately not HAMP. The way that these work, and as even in the Bushell case notes, it goes through a waterfall. Where does it tell us what the CHAMP guidelines are? It seemed to me that those were the same as the HAMP guidelines, in terms of the net present value, the amount of the loan, and the income, and all the rest. Well, I think it's a proprietary program where Chase did the analysis, and when it calculated based on the evidence, the undisputed evidence that was before the district court, there was an NPV calculation and the income. So she wasn't eligible for CHAMP? Based, after the review, based on the information she provided regarding her income. Let me just go back to, so number one, for the first modification in May, she didn't meet the NPV income, correct? Correct. So out goes that. Then comes number two, and it was my understanding that the NPV didn't change. Correct. Is that correct? I do not know. I don't know that. But I do know, based on the record, when Chase was conducting this second review. Let's just stop there. So you're saying the record doesn't reflect whether the NPV changed when we had the second modification? It's my understanding the second modification, which was ultimately denied because Mrs. Skouy failed to submit additional documentation, the NPV calculation would ultimately be determined on what her new and current income was, which would have changed or potentially changed, which is why a second review was conducted. Sort of a parallel. So there's the answer to my question that we don't know whether her NPV had changed? That's my understanding, is that we don't know what the NPV would be, and sort of this factor, even under the California Homeowners' Bill of Rights, under a 2920, I think it's 2923.6, if a borrower is denied initially for a loan modification and they have a change in their economic circumstances and can be reviewed again because there's a change in their income, we already have in the record that there was a denial letter sent in November 2009 of the first mod. That letter on page 551 of the record states that she was reviewed for not only HAMP, because that's the first step that this would go through, but also other proprietary programs that Chase has. And then she reapplied and sort of went through the analysis. The March 1st letter was issued with the trial payment plan, and then actually in the record a letter was sent on March 2nd saying, you're denied for HAMP because your loan balance exceeds the $729,000. How hard it is to figure out before when the whole thing starts, look, you're just not eligible, because the loan is too high and you're whatever it is. I mean, it seems to me that can be done in a second. I don't think it's that simple, Your Honor. And based on my experience Why not? All that stuff is on computers now. People can figure that really easily. I think a critical factor in determining whether a person qualifies for a loan modification is what their income is. And even in the deposition testimony, which I referenced in the record on pages 360, it's 353 through 371 or so, but 367 and 371 indicate that the prior information that Ms. Ascui had submitted had actually changed because she was no longer employed and did not have income. When it turns out that she's not eligible because of factors other than the payments, why don't you just give her the money back? What utility is there in keeping it? I believe it's the fact that she had a loan obligation on which she was indebted to pay these debts, and this was sort of a loss mitigation thing. There wasn't a federal requirement, and the federal directive should not be imputed into a proprietary program that Chase is reviewing. There's no obligation or duty for her to receive a loan mod. And while she's being reviewed, and I point out this foreclosure sale occurred in September 2011, and Ms. Ascui is still living in the property without having made a payment, and her payments, as she was owed, I see that I'm out of time. Is that in the record she's still living there? I believe it's probably, I don't know if it's still alleged in there, but she has not left the property. The sale has occurred, and simply just looking at it from a 30,000-foot level, a person took out a debt for $833,000 and defaulted on it. The servicer, Chase, here, reviewed the loan. It goes through a waterfall. I don't understand what you mean when you say waterfall. That sounds to me like something people drown in. Well, what it's called on page 924 of the Bushell case, 220 Calop 4th, 915 at page 924, it talks how they reviewed for different products. That's what the waterfall means. You reviewed for? Like CHAMP, HAMP, and all those? Yeah, all of those programs. And sort of because it didn't qualify for HAMP, Chase was reviewing it under its own program. As you would imagine, if someone has a $800,000, $900,000, $1 million loan, a critical factor to determine if someone can actually repay that debt, if the arrearages and everything would be recalculated, it would be a submission of your income and the proof of income. And as the deposition testimony shows, and the distinguishing difference here between the other jurisprudence in these cases is there was never a promise of a HAMP modification here. The terms of these trial payment plans didn't have the same language that were in Bushell. It didn't say if you complete the three making home affordable program payments that you will get a loan. It just says you will be considered for this. And I don't think that that's an unfair practice. Your industry created this mess and then a bunch of people got caught in it. Well, I would just respectfully ask that the court consider what the agreement says and what the borrower was put on notice of and the fact that throughout this whole time period she was living in the property and these payments under the trial payment plan were actually, I don't know, but I would assume they're not going to be greater than what her payments were originally as an obligation because she obviously defaulted on that. So the payments that she made were even less than she was already obligated to pay and it was a good faith gesture to review for these different programs and to see, all right, well she doesn't qualify for the HAMP program because it exceeds this balance. What can Chase do and what can the financial services, other lenders and services do to review these borrowers for other programs and just say, sorry, every homeowner in the country that has a loan over $729,000 can't be reviewed for a loan mod. I think that would be inherently something that might be unfair to people that have a loan greater than that. Thank you. So I don't think it's unfair here to say we're going to review you for these other proprietary programs. She hasn't been displaced from the property. She still lives in the property. Just review her, then take the money. Judge McKeown said thank you, by the way, if you didn't hear her. Yeah, I mean, you're kind of going on and on about what are the possibilities. We're kind of more interested in what happens. Oh, excuse me.  Thank you. Thank you, Your Honor. Thank you. So the big question posed by your colleague is where's the documentation on income? There is interrogatory answers on page 263 of the record that say she provided documentation of income at various points. Do you have the documentation? Is the documentation in the record? No, just the interrogatory answer. What happened is I think Chase submitted the interrogatory answer in support of its motion for summary judgment. So that is one reference to it. I think it was pay stubs, bank statements, maybe tax returns. But what I hear him saying and what I see from the summary judgment order is you don't have evidence of this. In other words, there's not a dispute about it. So my question is, is there somewhere in the record we're supposed to look to see the documentation? The actual document, no. Okay. Just the interrogatory answer. That interrogatory answer is pretty much worthless, isn't it? That's like saying I have a lot of assets. That would be my answer. Actually, I don't have that many. Or I could say I don't have that many assets. That wouldn't really illuminate too much my financial condition. Yeah, but consider that this dispute over documentation really only concerns the third loan modification application in late November 2010. It didn't really concern the first two. Well, on the second one, is there any evidence that her NPV or income had not changed or had changed? I don't believe so. So there's no indication one way or the other? Right. I don't believe it. I don't believe there's any evidence that it changed one way or the other now. In fact, the only evidence on the subject really comes from sort of chases sort of after the fact rationalization. If you look at the denial letters for the first two, they really don't talk about this. In fact, they only usually say about one sentence or two sentences as to the reason for the denial. So what we're hearing now is sort of a post-litigation-induced rationalization for what they did. But getting back to Judge Trott's point, this all started with the issuance of a notice of default, which is how the foreclosure process starts in California. Notice of default is supposed to say how much is owed total on the loan. And it also is supposed to give, I think, an amount that can be paid to reinstate the loan and cancel a notice of default. So this notice of default, which predates all this, gave an amount well over the HAMP guidelines. I think it was over $830,000. Yes.  The guideline was $700,000. Right. And this was a document generated by Chase and its foreclosure agent. So they knew up front. They knew up front she didn't qualify. And so she goes through this process. She makes all her modification payments on time. There's no dispute of that. First time around. Yeah. And the second time around. Yes. Okay. Not the third time around. She makes some on the third time around and then stops. But there's no dispute the first two times she did. She makes these payments. Now, what are these payments for? We hear from counsel that, well, she's obligated under the loan to keep on making payments. Actually, no. Under the California one-action rule, when you're in a situation like this as a lender or servicer, you either get the property back through foreclosure or you get the loan payments. You don't get both. Right. And she was not told in the notice of default, in the three trial period payment letters, that, by the way, you have to pay this anyway under your loan. No. She was told you're making these payments so we can either consider you for a loan modification or we'll give you a loan modification. That's what she's told. She hasn't told any of this, that you have to continue making it. So, again, this is a post-litigation rationalization for why they took the money. Thank you. Thank you. Thank both counsel for your arguments this morning. The case of Asculi v. J.P. Morgan Chase is submitted.
judges: Trott, McKeown, Watford